**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**1:18-cv-293-FDW**

| | | |
|---|---|---|
| JOHN ANTHONY HILL, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| DERRICK PALMER, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |
| ————————————————— | ) | |

**THIS MATTER** is before the Court on initial review of *pro se* Plaintiff's Amended Complaint, (Doc. No. 6). Plaintiff is proceeding *in forma pauperis*. (Doc. No. 10). Plaintiff has filed two Letters, (Doc. Nos. 3, 7), that are construed as Motions for the Appointment of Counsel, and a third Letter, (Doc. No. 11), is construed as a Motion for Default Judgment.

## I.     BACKGROUND

*Pro se* Plaintiff, who is a pretrial detainee, filed a civil rights suit pursuant to 42 U.S.C. § 1983, addressing incidents that allegedly occurred at the Cherokee County Detention Center ("CCDC"). He names as Defendants Cherokee County Sheriff Derrick Palmer; CCDC Captain Mark Patterson; CCDC Lieutenant Jeremy Bresch, and CCDC Head Nurse Carrie Colwell. Plaintiff also attempts to add Colwell's employer, Southern Health Partners, as a Defendant. (Doc. No. 6 at 3, 17).

Construing the Amended Complaint liberally and accepting it as true, Plaintiff alleges that Palmer is legally responsible for the overall operation of the sheriff's department and the detention center medical, their conduct, and their ability to provide adequate medical treatment and respond reasonably to medical care that is glaringly inexcusable or bad, and overseeing CCDC

1

administration. Patterson is legally responsible for the administrative staff and the welfare of all inmates at the facility.

When Plaintiff was booked at CCDC, he answered medical questions indicating that he had serious medical needs, stating "back, neck and shoulder pain from accident. Right knee swollen and painful, diagnosed as needing replaced." (Doc. No. 6 at 4). Plaintiff's cane was taken away and not replaced. Two molars have painful cavities. He has arthritis, very poor blurry vision for which he needs prescription glasses, and he was diagnosed with Hepatitis-C, "physician concerned with possible cirrhosis." (Doc. No. 6 at 4). He has a history of heavy alcohol use and high tolerance for prescription pain medication "and will need to be detoxed." (Doc. No. 6 at 4). Plaintiff is unemployed and applied for disability twice due to "injuries, great pain, health issues and disabilities." (Doc. No. 6 at 4).

Defendants were also informed of Plaintiff's serious medical needs "by physicians medical records, files, hospital records, jail doctors, examinations, blood work, Hepatitis-C blood panel, which is a serious contagious disease that can cause cirrhosis, liver disease and death if not treated." (Doc. No. 6 at 4). An ultrasound showed enlarged liver. X-rays of Plaintiff's right knee and right shoulder show "existing rotator cuff injury, bone spurs, numerous requests, sick call and grievances up to Lieutenant, Captain and Sheriff, wanting medications, cane, knee brace, dental appointments, eye exam and glasses, Hepatitis-C treatment." (Doc. No. 6 at 4-5).

Officials made a dental appointment for Plaintiff after "months of near-constant complaining." (Doc. No. 6 at 5). One molar was extracted surgically but part of the root was left due to wires in the jaw from a previous injury. The other tooth and root are to be taken later, "causing pain." (Doc. No. 6 at 5). After months of grievances requesting medical treatment, Plaintiff was taken to a liver specialist in Franklin who, after additional testing, "confirmed the

Hepatitis-C disease, mandated treatment and scheduled appointments to start shots." (Doc. No. 6 at 5). After many more requests, sick calls, and grievances for failure to provide adequate medical care and determine the cause of extreme back and neck pain, Patterson told Plaintiff "it must be age," which effectively denied medical care. (Doc. No. 6 at 5). Patterson also denied a knee brace and eye exam and eyeglasses. Plaintiff alleges that he has "blurry, deteriorating vision causing headaches, impairing daily activities." (Doc. No. 6 at 5). Plaintiff filed sick call requests asking why he wasn't being taken to a physician for treatment of Hepatitis-C that was "diagnosed and mandated treatment," but "[m]edical said it was 'too expensive'" (Doc. No. 6 at 5-6).

Plaintiff requested medical again for an eye exam and eyeglasses. No prescription glasses were given. Medical provides reading glasses that are not needed and worsens vision and headaches. Medical paid for inmate Corey Luther's prescription eyeglasses. "Captain says inmate will have to pay cost of eye exam, glasses" and failed to provide glasses until Plaintiff's vision became intolerable. (Doc. No. 6 at 8). Plaintiff was "[f]orced to pay $488 to Andrews Eye Care." (Doc. No. 6 at 8). Plaintiff filed an ADA complaint with the Department of Justice. His efforts with medical for treatment for Hepatitis-C, back pain, knee pain, cortisone/steroid shots for knee and shoulder pain, and knee brace were denied.

Plaintiff suffered a serious head injury and had two teeth broken off at the gums while in the B-pod dayroom in a "possible attack by inmates." (Doc. No. 6 at 6). Plaintiff woke up in an ambulance with Williams on the way to the E.R., bloody and in pain. Plaintiff wanted to know what happened "but no-one knows" even though the dayroom was full of people. (Doc. No. 6 at 6). Plaintiff wants to know what the video camera shows. He suffered a concussion, a gash on the head that required stitches and x-rays, a busted mouth, lips, and a cut tongue. There was nothing more the E.R. could do for Plaintiff's broken teeth and exposed nerves so medical would have to

make a dentist appointment. He was prescribed 12 pain pills until the teeth could be fixed.

Defendants moved Plaintiff to medical. After about 4 days, Plaintiff only received two pills and was told the prescription was empty. (Doc. No. 6 at 7). Plaintiff was moved back to B-pod where he waited for over a month to see a dentist who pulled one tooth and ground the other down instead of fixing his teeth whereas another inmate fell, suffered broken teeth and got a partial. (Doc. No. 6 at 7).

Plaintiff asked Colwell about extracting a tooth that has a painful cavity that is sensitive to hot and cold and a possible exposed nerve. She said a tooth must be abscessed, infected, and leaking pus and Plaintiff must fill out three sick-calls ($20 each) plus costs of antibiotics and ibuprofen if prescribed. An inmate may pay for extraction if these requirements are not met. Plaintiff states "[d]ental treatment refused, requirements not met (new)." (Doc. No. 6 at 12).

Plaintiff was assaulted by inmate Jackie Slaughter and suffered a bloody, potentially broken nose. Medical gave him an ice pack and he was moved to Pod-A. After "many sick calls" Plaintiff was issued nasal spray to help him breathe. Another inmate, Larry Reid, had cartilage drilled out of his nose for a deviated septum to help him breathe.

Bresch moved Plaintiff from Max 23-hour lockdown to general population on the upper floor, top bunk, "knowing the pain and medical issues." (Doc. No. 6 at 6). Bresch was told he was acting with deliberate indifference to these unreasonable and potentially dangerous changes, and Bresch said "it's therapy." (Doc. No. 6 at 6). Forcing Plaintiff to be housed upstairs in a top bunk is painful and dangerous to his health. Plaintiff confronted Bresch about lack of treatment and an altercation ensued during which Plaintiff was tased. Plaintiff wrote to the Sheriff and civil rights groups and filed grievances.

Plaintiff was infected with "staph/MRSA" at least four times. (Doc. No. 6 at 8). Medical

was notified each time and antibiotics and ibuprofen were given. Colwell would surgically drain pus from abcessed boils, but Plaintiff was "[n]ever isolated from general population to stop the spread of the virus." (Doc. No. 6 at 8). Plaintiff developed another staph/MRSA infection in February and March 2018. He submitted a sick call to "medical" and a nurse prescribed antibiotics which did not help. It got worse, larger, and more painful. After more attempts to get medical attention, the boil got as large as a lemon under the left armpit. "Nurse" called Dr. Rebecca Gray who was on vacation, who said to switch antibiotics and give ibuprofen for pain. Colwell left for the weekend. At "med-pass" the weekend nurse and Sgt. Robertson "said the Captain and Lieutenant said not to give any ibuprofen even after Dr. Gray ordered it." (Doc. No. 6 at 9). The pain was severe. Plaintiff complained for over a week about the serious pain. Grievances to the Lieutenant and Captain did not do any good. The sheriff was written. (Doc. No. 6 at 9). Plaintiff stopped every officer, showed them the boil and how it spread down the ribcage towards the hip, "trenching," with nowhere else for the pus to go. Plaintiff told staff that he was not allowed pain meds. Sgt. Robertson, Sgt. Gunter, Sgt. Dayly and other floor officers gave pain medicine. Plaintiff's roommate, Valerie Myers, and officers Steve Zoller, Brandi Spiva, Tiffany Enloe and Sandy Guffey are witnesses. (Doc. No. 6 at 9).

Dr. Gray determined that the MRSA infection "looked like carbuncle and trenching and believed it to be in the bloodstream." (Doc. No. 6 at 10). She said it was the worst case she had ever seen and was considering hospitalization. She started antibiotic and pain medication by needle. Nurse Colwell "acted mad and said no-one has ever got a pain shot here before." (Doc. No. 6 at 10).

Plaintiff told Dr. Gray about Bresch and the Captain not allowing staff to give ibuprofen and that officials were charging Plaintiff's account $20 for each visit and antibiotic and pain shot.

(Doc. No. 6 at 10). The doctor said there was not to be any charge and told officials this. "Abscessed boil was surgically drained and Doctor orders back ibuprofen." (Doc. No. 6 at 10).

Bresch knew of the serious and contagious staph infection Plaintiff was suffering in constant pain, yet "he and other officials" showed deliberate indifference, and sadistic and malicious conduct by denying him pain medication and treatment which caused a severe life-threatening infection to spread in the bloodstream. Even though jail officials are required to take steps to prevent the spread of MRSA, they allowed Plaintiff to return to the general population with a contagious open wound which put other inmates at a great risk of being infected. (Doc. No. 6 at 10).

Plaintiff had to be taken to the nurse's station to have pus/fluid drained from the ribcabe/armpit daily for about a week. Plaintiff was charged $135 after Dr. Gray said he should not be charged. Plaintiff asked Bresch about this and he said "I have to pay when I get medical attention, you're no different." (Doc. No. 6 at 11).

Plaintiffs outgoing and incoming mail is stopped and censored, "[l]egal and religious alike." (Doc. No. 6 at 8, 12). Plaintiff continued with the grievance process and starts writing the Sheriff, civil rights groups, internal affairs, safe and humane jails project, county manager, county attorney, attorney general, threatening to sue. "Staff" refused to hive mail-log and magazines that Plaintiff paid out of his account. (Doc. No. 6 at 12). Bresch renewed seven subscriptions and refused to give Plaintiff Rock of Ages Discipleship Courses Plaintiff' was taking, all religious materials from various ministries were denied, as well as daily devotionals.

Plaintiff sent the Sheriff a letter through is attorney telling him of the retaliation, mistreatment and civil rights violations. Patterson returned the mailed letter to Plaintiff, "angry that the sheriff got the letter and immediately transferred plaintiff to Macon Co. Detention Ctr.

Even though CCDC houses approximately twelve MCDC inmates at any given time." (Doc. No. 6 at 12).

"Plaintiff was in general population and placed in Max segregation 23-hr lockdown on 4-23-18 to 9-4-18 while in MCDC." (Doc. No. 6 at 12-13). While in MCDC Plaintiff continued to write the sheriff, county manager, county attorney, who advised sheriff to give Plaintiff his mail that was "boxed up" for over a year. (Doc. No. 6 at 13).

Plaintiff wrote Human Rights Defense Center, the ACLU, Internal Affairs, SBI, Attorney General, and many others. Sheriff and Chief Dept. Joe Wood go to MCDC to see plaintiff and ask what he wants. Plaintiff wants reimbursement for medical charges and magazines and newspapers that were being held, mail, and fair medical treatment. "Sheriff says to send him and Co. Attny proof." (Doc. No. 6 at 13).

Plaintiff sent Sheriff Palmer and County Attorney Darryl Brown statements and copies of all grievances, sick calls, magazine covers with names of other inmates receiving them, detailed complaints about what is going on at CCDC after verbally telling sheriff and Wood. After repeated attempts to resolve these issues with the sheriff, Brown, and County Manager Wiggins, Plaintiff never got a response. Plaintiff even asked Sheriff to settle for $800 to reimburse Plaintiff for his expenses.

While in segregation at MCDC, Plaintiff submitted a sick call about a decayed painful tooth that was denied medical attention at CCDC. Jail Doctor Creel promptly scheduled a dentist appointment and the tooth was extracted for free. Creel ordered a blood panel for Hepatitis-C and requested files from liver specialist, Dr. Berrier, to see why treatment was not administered after it was mandated. "Increased meds." (Doc. No. 6 at 14).

Plaintiff continued to write to the Sheriff, Wiggins, Brown, Scout newspaper, Andrews

7

Journal newspaper, civil rights centers, the state auditor, County Finance Director Candy Anderson who was doing an audit on CCDC, the SBI which was investigation CCDC about the suspicious death of an inmate and the beating of a handcuffed federal inmate. CCDC paid Stokes $800 not to litigate. Plaintiff writes to DOJ, Internal Affairs, Governor Roy Cooper, Congressman Mark Meadows, and county commissioners. Plaintiff receives letter from Brown stating he had a meeting with Sheriff Palmer and Patterson, stating he advised them to turn over Plaintiff's "boxed up" mail without delay. (Doc. No. 6 at 14).

"Officials" sent Plaintiff approximately three dozen magazines, many of which were not his, and there should have been at least 124, and sent him "some religious material but not all. No newspapers." (Doc. No. 6 at 15). The Macon County mail log shows what is included. Wood came to see Plaintiff at Macon on August 8, 2018 to let him know he was looking into Plaintiff's allegations and an internal investigation. Palmer came to Macon on August 15, 2018 after four months of segregation to see what Plaintiff wanted. Plaintiff told the Sheriff about "civil rights being violated, drugs, cell phones, vigilante justice carried out by officers or officers paying inmates to do it." (Doc. No. 6 at 15). Plaintiff stated he feared going back to CCDC because more retaliation would ensue.

"Defendants" moved Plaintiff back to CCDC and placed him in max segregation 23-hour lockdown. Punishment continues for "no reason" on September 4, 2018 and Plaintiff still in "Max" as of November 5, 2018. (Doc. No. 6 at 15).

Palmer and Defendants were deliberately indifferent to the violations of Plaintiff's First and Fourteenth Amendment rights by knowing of the risk and failing to respond reasonably or by failing to act. They were notified by grievance, letters, health history, inmate fights, incident reports, the county attorney, civil rights groups, letters to the sheriff and personal interviews with

the sheriff and Wood. Plaintiff's needs, unwarranted punishment, and medical care neglect show interference with serious medical needs.

Eyeglasses and Hepatitis-C treatment were mandated and never given. Broken teeth were delayed over a month, causing excessive and wanton pain before extraction. Plaintiff's back, neck, and knee were untreated. He was denied pain medications for MRSA, which was not property diagnosed or treated by a specialist. He was given three different antibiotics which caused the spread of the infection, severe pain, and was returned to gen pop with a contagious open wound. Colwell cut Plaintiff's pain medications by nearly 70% and his anxiety and mental health by 50% and will not follow up or get medical records from MCDC.

Plaintiff wrote grievances and mailed out lawsuits on October 8 and 10, 2018 and learned that Bresch "has intercepted them and taken them out of the mail-log on the computer." (Doc. No. 6 at 15). Morris logged them in and Officer Chandler says they were taken out of the computer. Plaintiff confronted Bresch and he said "he does not have to provide mail-log nor does he have to prove it." (Doc. No. 6 at 16). An "altercation" ensued; Bresch "choke[d] plaintiff out in Max dayroom," witnessed by all inmates. (Doc. No. 6 at 16). Bresch locked Plaintiff down for 14 days with no hour out. Plaintiff wrote grievances which did not help. "Defendants" say they do not have to give an hour out, contrary to North Carolina statutes. (Doc. No. 6 at 16-17).

Plaintiff claims that he was repeatedly delayed/denied medical care resulting in further, more serious injuries and will continue to cause unnecessary and wanton infliction of pain, and that he will continue to be irreparably injured by Defendants' conduct unless the Court grants declaratory and injunctive relief. Plaintiff seeks declaratory judgment, compensatory and punitive damages, fees and costs, other just and equitable relief that the Court deems necessary.

## II.     STANDARD OF REVIEW

Because Plaintiff is a prisoner proceeding *in forma pauperis*, the Court must review the Complaint to determine whether it is subject to dismissal on the grounds that it is "(i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). In its frivolity review, a court must determine whether the Complaint raises an indisputably meritless legal theory or is founded upon clearly baseless factual contentions, such as fantastic or delusional scenarios. Neitzke v. Williams, 490 U.S. 319, 327-28 (1989). A complaint should not be dismissed for failure to state a claim "unless 'after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.'" Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999)).

A *pro se* complaint must be construed liberally. Haines v. Kerner, 404 U.S. 519, 520 (1972); see also Smith v. Smith, 589 F.3d 736, 738 (4th Cir. 2009) ("Liberal construction of the pleadings is particularly appropriate where … there is a pro se complaint raising civil rights issues."). However, the liberal construction requirement will not permit a district court to ignore a clear failure to allege facts in his complaint which set forth a claim that is cognizable under federal law. Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990). A *pro se* complaint must still contain sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007); see Ashcroft v. Iqbal, 556 U.S. 662 (2009) (the Twombly plausibility standard applies to all federal civil complaints including those filed under § 1983). This "plausibility standard requires a plaintiff to demonstrate more than a sheer possibility that a defendant has acted unlawfully." Francis v.

Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted). He must articulate facts that, when accepted as true, demonstrate he has stated a claim entitling him to relief. Id.

### III.    DISCUSSION

**(1)    Parties**

**(A)    Individuals not named as Defendants**

The Federal Rules of Civil Procedure provide that, "[i]n the complaint the title of the action shall include the names of all the parties." Fed. R. Civ. P. 10(a); see Myles v. United States, 416 F.3d 551 (7th Cir. 2005) ("to make someone a party the plaintiff must specify him in the caption and arrange for service of process."). Although *pro se* litigants are entitled to have their pleadings liberally construed, Haines, 404 U.S. at 520, "[d]istrict judges have no obligation to act as counsel or paralegal to *pro se* litigants," Pliler v. Ford, 542 U.S. 225 (2004).

The body of the Amended Complaint contains allegations against individuals who are not named as defendants in the caption as required by Rule 10(a). This failure renders Plaintiff's allegations against them nullities. See, e.g., Londeree v. Crutchfield Corp., 68 F.Supp.2d 718 (W.D. Va. Sept. 29, 1999) (granting motion to dismiss for individuals who were not named as defendants in the compliant but who were served). The allegations directed at individuals not named as Defendants are therefore dismissed without prejudice.

**(B)    Private Corporation**

Private corporations cannot be saddled with § 1983 liability via *respondeat superior* alone. See Monell v. New York City Dep't of Social Servs., 436 U.S. 658 (1978) (municipalities and other local government entities are considered "persons" under § 1983 but they are not liable via *respondeat superior* alone); Powell v. Shopco Laurel Co., 678 F.2d 504, 506 (4th Cir. 1982) (the

principles of § 1983 municipal liability set forth in <u>Monell</u> and its progeny apply equally to the liability of private corporations, and cannot be predicated solely on a theory of *respondeat superior*); <u>see</u> <u>also</u> <u>Austin v. Paramount Parks, Inc.</u>, 195 F.3d 715, 728 (4th Cir. 1999) (private companies that employ individuals acting under color of state law are liable under § 1983 "only when an official policy or custom of the corporation causes the alleged deprivation of federal rights.") (citations omitted).

Plaintiff seeks to proceed against Defendant Colwell's employer, Southern Health Partners, on a theory of *respondeat superior*. Plaintiff has failed to state any cognizable § 1983 claim against Southern Health Partners, and therefore, the claims against it will be dismissed without prejudice.

### (C)     <u>Suit on Behalf of Others</u>

A *pro se* prisoner is precluded from making claims on behalf of others. <u>See</u> <u>Hummer v. Dalton</u>, 657 F.2d 621, 635-26 (4th Cir. 1981) (a prisoner cannot act as a "knight-errant" for others); <u>Oxendine v. Williams</u>, 509 F.2d 1405 (4th Cir. 1975) ("it is plain error to permit [an] imprisoned litigant who is unassisted by counsel to represent his fellow inmates in a class action.").

Liberally construing the Amended Complaint, it appears that Plaintiff is alleging that Defendants allowed Plaintiff to remain in the general population while he had a contagious MRSA infection. To the extent the Amended Complaint seeks relief on behalf of individuals other than the Plaintiff, these claims are dismissed.

### (2)     <u>Due Process</u>

The Supreme Court has observed that "[d]ue process requires that a pretrial detainee not be punished" whereas a sentenced inmate may be punished, although that punishment may not be "'cruel and unusual' under the Eighth Amendment." <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 n, 16 (1979). The due process rights of a pretrial detainee are therefore "at least as great as the eighth

amendment protections available to the convicted prisoner….'" Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988).

**(A)** **Excessive Force**

The Due Process Clause of the Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment," Graham v. Connor, 490 U.S. 386, 395 n.10 (1989), and is not "an incident of some other legitimate governmental purpose," Bell, 441 U.S. at 538. An objective reasonableness test applies in pretrial detainee excessive force cases: (1) was the act purposeful (not negligent or accidental), and (2) was the force objectively unreasonable. See Kingsley v. Hendrickson, 135 S.Ct. 2466, 2473 (2015). Subjective questions like ill will and malice are not appropriate. Id.; see Duff v. Potter, 665 Fed. Appx. 242 (4th Cir. 2016). In determining whether the force was objectively unreasonable, a court considers the evidence from the perspective of a reasonable officer on the scene without the benefit of 20/20 hindsight. Kingsley, 135 S.Ct. at 2473. Considerations that bear on the reasonableness or unreasonableness of the force include: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. Id. A "bystander officer" could be liable for his or her failure to intervene if he or she: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." Randall v. Prince George's Cnty., 302 F.3d 188, 204 (4th Cir. 2002).

Plaintiff alleges that Defendant Bresch maliciously and sadistically tased and choked him during an altercation about lack of treatment in the maximum-security dayroom. Plaintiff's claims

are sufficient to pass initial review against Defendant Bresch. However, to the extent that Plaintiff suggests the other Defendants failed to intervene and stop Bresch's use of force, such a claim is insufficient to proceed because Plaintiff has not alleged that any of the other Defendants were present and had the opportunity to intervene and failed to do so. Therefore, Plaintiff's excessive force claim will be permitted to proceed against **Defendant Bresch** but he has failed to state a claim for failure to protect or failure to intervene against Bresch or the other Defendants.

### (B)    Failure to Protect

Prison officials must "take reasonable measures to guarantee [prisoners'] safety…," and this includes the duty to protect prisoners from violence at the hand of other prisoners. Hudson v. Palmer, 468 U.S. 517, 526-27 (1984); see Farmer v. Brennan, 511 U.S. 825, 832-34 (1994) (citing the Eighth Amendment[1]). To obtain relief under § 1983 on a claim of failure to protect from violence by other inmates, a plaintiff must show: (1) he is incarcerated under conditions posing a substantial risk of serious harm; and (2) the prison officials had a "sufficiently culpable state of mind," which in this context is deliberate indifference. Farmer, 511 U.S. at 833. A prison official is "deliberately indifferent to a substantial risk of harm to a [prisoner] when that [official] 'knows and disregards' the risk." Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 302 (4th Cir. 2004) (quoting Farmer, 511 U.S. at 837). "It is not enough to prove that the official should have known of the risk; instead, 'the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he should draw the inference.'" Kartman v. Markle, 582 Fed. Appx. 151, 153 (2014) (quoting Farmer, 511 U.S. at 837). A showing of negligence does not rise to the level of deliberate indifference. Davidson v. Cannon, 474 U.S. 344,

---

[1] The courts have used the same deliberate indifference standard under the Eighth and Fourteenth Amendments. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239 (1983). This appears to be unchanged by Kingsley. See, e.g., United States v. Broussard, 882 F.3d 104, 109-10 (5th Cir. 2018).

347-48 (1986).

To the extent that Plaintiff suggests that any of the Defendants failed to protect him from violence from other inmates, this claim will be dismissed because Plaintiff has not alleged that any of the Defendants were aware of, and ignored, a substantial risk of harm.

**(C)**     <u>**Medical and Dental Needs**</u>

Prison officials must provide sentenced prisoners with adequate medical care. <u>See</u> <u>Hudson v. Palmer</u>, 468 U.S. 517, 526-27 (1984); <u>Farmer</u>, 511 U.S. at 832-34. A pretrial detainee makes out a due process violation if he shows "deliberate indifference to serious medical needs" within the meaning of <u>Estelle v. Gamble</u>, 429 U.S. 97, 104-05 (1976). <u>See</u> <u>generally</u> <u>Heyer v. U.S. Bureau of Prisons</u>, 849 F.3d 202, 210 (4th Cir. 2017) <u>see</u>, <u>e.g.</u>, <u>Martin v. Gentile</u>, 849 F.2d 863 (4th Cir. 1988) (applying the deliberate indifference standard to an arrestee's claim of inadequate medical care). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotation marks omitted). To constitute deliberate indifferent to a serious medical need, "the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive to shock the conscience or to be intolerable to fundamental fairness." <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1990), *overruled on other grounds by* <u>Farmer</u>, 511 U.S. at 825.

Plaintiff alleges that he entered CCDC with a number of serious medical needs and developed additional painful and serious medical and dental needs while he was at CCDC. He claims that he informed Defendants of these needs on numerous occasions beginning at his booking, through sick calls, complaints, grievances, and letters. He claims that treatment and

medication were reduced, denied, and/or unreasonably delayed, which caused Plaintiff pain and exacerbated his conditions. He also appears to allege that some treatment was denied or delayed, at least in part, due to cost and/or his inability to pay. Further, Plaintiff alleges that Defendant Bresch moved him to the general population in an upper bunk despite knowing that his medical issues would render such placement painful and dangerous. Plaintiff has sufficiently alleged claims for deliberate indifference to serious medical and dental needs and they will be permitted to proceed against **Defendants Palmer, Patterson, Bresch,** and **Colwell.**

    **(D)**    <u>**Conditions of Confinement**</u>

A typical substantive due process claim by a pretrial detainee challenges the general conditions of confinement or the treatment of all detainees in a specific facility. <u>Williamson v. Stirling</u>, 912 F.3d 154, 174 (4th Cir. 2018). To prevail on such a claim, a pretrial detainee must show that a particular restriction was either: "(1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective." <u>Slade v. Hampton Road Reg'l Jail</u>, 407 F.3d 243, 251 (4th Cir. 2005).

A pretrial detainee challenging individually-imposed restrictions – as opposed to shared conditions of confinement – is entitled to pursue a procedural due process claim. <u>Williamson</u>, 912 F.3d at 174. Disciplinary and security restrictions must be rationally related to a legitimate governmental purpose, and pretrial detainees must be afforded at least the procedural protections that are afforded prisoners. If the treatment of a pretrial detainee is so disproportionate, gratuitous, or arbitrary that it becomes a categorically prohibited punishment, it will sustain a substantive due process claim. <u>Id.</u> at 175. Further, pretrial detainees have at least the rights of convicted prisoners so jail officials must provide the detainee with at least the procedural protections afforded prisoners. <u>Id.</u> at 176; <u>see</u> <u>Bell</u>, 441 U.S. at 545.

Plaintiff alleges that Defendants Palmer, Patterson, and Bresch placed him in segregated housing, with its attendant punitive conditions of confinement, without justification and without any procedural protections. Plaintiff's procedural and substantive due process claims with regards to the conditions of his confinement are sufficient to proceed against **Defendants Palmer, Patterson,** and **Bresch.**

### (E)     Grievances

"[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state." Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994). A prisoner's "access to and participation in the prison's grievance process are not constitutionally protected…." Taylor v. Lang, 483 Fed. Appx. 855, 857 (4th Cir. 2012).

To the extent that Plaintiff alleges Defendant Bresch interfered with the grievance procedure and that Defendants Palmer and Patterson denied or failed to respond to his grievances, this claim cannot proceed because there is no right to engage in the grievance procedure. Therefore, these claims will be dismissed.

### (F)     Investigation

"The Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1989))). For instance, there is no right to an investigation into an incident. See, e.g., Vinyard v. Wilson, 311 F.3d 1340, 1356 (11th Cir. 2002) (arrestee had no constitutional right to internal investigation of excessive force claim).

Plaintiff appears to allege that Defendants Palmer, Patterson and Bresch failed to investigate the incident where Plaintiff lost consciousness and was injured in the dayroom which,

he claims, could have been due to an attack by another inmate. However, Plaintiff had no right to have the incident investigated and therefore this claim will be dismissed.

**(G)** **Deprivation of Property**

Where a state employee's random, unauthorized act deprives an individual of property, either negligently or intentionally, the individual is relegated to his state post-deprivation process, so long as the State provides an adequate post-deprivation remedy. Hudson v. Palmer, 468 U.S. 517 (1984); Parratt v. Taylor, 451 U.S. 527 (1981), *overruled on other grounds by* Daniels v. Williams, 474 U.S. 327 (1986)). However, post-deprivation remedies do not satisfy the due process requirement where the deprivation complained of is effected pursuant to an established state procedure rather than a random, unauthorized action. Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982). Under North Carolina law, an action for conversion will lie against a public official who wrongfully deprives an owner of his property by an unauthorized act. Gallimore v. Sink, 27 N.C.App. 65, 67, 218 S.E.2d 181, 182 (1975). North Carolina's post-deprivation remedies are adequate. N.C. Gen. Stat. § 143-291; see Wilkins v. Whitaker, 714 F.2d 4, 6 (4th Cir. 1983) (due process satisfied where North Carolina tort law provides an adequate avenue for relief for state prisoner).

Plaintiff appears to allege that Defendant Bresch renewed Plaintiff's mail subscriptions and that Palmer, Patterson, and Bresch then withheld those materials from him for over a year. He also appears to allege that Defendants Palmer, Patterson, Bresch, and Colwell erroneously charged him for various medical fees. It is unclear at this juncture whether Plaintiff's alleged property losses resulted from a random, unauthorized action or established jail procedure. Therefore, Plaintiff's due process claims for erroneous charges and the deprivation of property will be permitted to proceed against **Defendants Palmer, Patterson, Bresch,** and **Colwell**.

**(3)**     **Free Speech and Free Exercise**

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech…." U.S. Const. Amend I. The First Amendment applies to the states through the Fourteenth Amendment. See Everson v. Bd. of Educ., 330 U.S. 1, 15 (1947). A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Pell v. Procunier, 417 U.S. 817, 822 (1974); Pittman v. Hutto, 594 F.2d 407, 410 (4th Cir. 1979). When a prison restriction infringes upon an inmate's First Amendment rights, the alleged infringement "must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." Bell, 441 U.S. at 547 (citing Jones v. N.C. Prisoners' Labor Union, 433 U.S. 119, 129 (1977)).

**(A)**     **Mail**

As a general rule, prisoners have the right to both send and receive mail. See Thornburgh v. Abbott, 490 U.S. 401, 408 (1989); Pell, 417 U.S. at 817. Restrictions on this right are valid if they are reasonably related to legitimate penological interests. Turner v Safley, 482 U.S. 78, 89 (1987). For instance, a prisoner's First Amendment interest in corresponding does not preclude prison officials from examining mail to ensure that it does not contain contraband. Wolff v. McDonnell, 418 U.S. 539, 576 (1974).

Plaintiff alleges that **Defendants Palmer, Patterson,** and **Bresch** denied or delayed his mail for over a year and, when they were ordered to return his boxed up mail to Plaintiff, he received only a part of his materials. This claim is not clearly frivolous and will be permitted to proceed.

**(B)**     **Religion**

For government conduct to survive scrutiny under the Establishment Clause, "(1) it must have a secular purpose; (2) its principal or primary effect must neither advance nor inhibit religion; and (3) it must not foster an excessive government entanglement with religion." Buxton v. Kurtinitis, 862 F.3d 423, 432 (4th Cir. 2017) (citing Lemon v. Kurtzman, 403 U.S. 602, 612–13 (1971)); see also Madison v. Riter, 355 F.3d 310, 316 (4th Cir. 2003). To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened his exercise of that belief. Hernandez v. C.I.R., 490 U.S. 680, 699 (1989). A prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is "reasonably related to legitimate penological interests." O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (quoting Turner, 482 U.S. at 89). In deciding whether a defendant's actions can be sustained as reasonably related to legitimate penological interests, the court must consider the following four factors: (1) whether there is a valid, rational connection between the regulation and the legitimate penological interest; (2) whether there are alternative means of exercising the right in question that remain open to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) whether ready alternatives exist which accommodate the right and satisfy the penological interest. See Turner, 482 U.S. at 89-90.

Plaintiff alleges that Defendants Palmer, Patterson, and Bresch violated his freedom of religion by denying his daily devotionals and religious materials from various ministries and Rock of Ages Disciples courses for over a year. These allegations are insufficient to proceed because Plaintiff has not alleged facts showing that he held a sincere religious belief, or that the official action or regulation substantially burdened his exercise of that belief. Therefore, Plaintiff's free

exercise claims will be dismissed.

**(C)**     **Retaliation**

The First Amendment right to free speech "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for exercising that right." Suarez Corp. v. McGraw, 202 F.3d 676 (4th Cir. 2000); see Am. Civil Libs. Un. of Md., Inc. v. Wicomico Cnty., 999 F.2d 780, 785 (4th Cir. 1993) ("Retaliation, though it is not expressly referred to in the constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights."). Prison officials may not retaliate against an inmate for exercising a constitutional right. See Hudspeth v. Figgins, 584 F.2d 1345, 1347 (4th Cir.1978). To succeed on such a claim, a plaintiff must establish: (1) his or her speech was protected; (2) the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech; and (3) a causal relationship exists between the speech and retaliatory action. Suarez, 202 F.3d at 686; see also Adams, 40 F.3d at 75; Wicomico Cnty., 999 F.2d at 785; Huang v. Bd. of Governors of Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990). In the prison context, such claims are treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." Adams, 40 F.3d at 74.

Plaintiff appears to allege that that Defendants Palmer, Patterson, and Bresch retaliated against him for writing letters and grievances complaining about the conditions of his confinement, and that he was exposed to punitive transfers and housing placements as a result of exercising his First Amendment rights. He also appears to allege that Defendants Patterson and Bresch retaliated against him by instructing a nurse not to give him medication for the severe pain from his MRSA infection. These allegations are sufficient to proceed against **Defendants Palmer, Patterson,** and

**Bresch.**

**(4)      Supplemental Jurisdiction**

The district courts have supplemental jurisdiction over claims that are so related to the claims over which the court has original jurisdiction that they "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A court may decline to exercise supplemental jurisdiction if: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c)(1)-(4).

Plaintiff appears to allege that **Defendants Palmer, Patterson** and **Bresch** violated North Carolina law, G.S. 153A-221, by confining him to his cell 24 hours per day without recreation time. (Doc. No. 6 at 17). Plaintiff's § 1983 claims with regards to the conditions of his confinement have passed initial review and the Court will exercise supplemental jurisdiction over Plaintiff's claim under North Carolina at this time.

**(5)      Preliminary Injunction**

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (citing Munaf v. Geren, 553 U.S. 674, 689-90 (2008)). A preliminary injunction is a remedy that is "granted only sparingly and in limited circumstances." MicroStrategy, Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001) (quoting Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 816 (4th Cir. 1991)). To obtain a preliminary injunction, a movant must demonstrate: (1) that he is likely to succeed on the merits;

(2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. <u>DiBiase v. SPX Corp.</u>, 872 F.3d 224, 230 (4th Cir. 2017) (quoting <u>Winter</u>, 555 U.S. at 20).

The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits. <u>See</u> <u>Pashby v. Delia</u>, 709 F.3d 307, 319 (4th Cir. 2013). By contrast, a mandatory injunction "goes well beyond simply maintaining the status quo *pendent lite*, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." <u>Taylor v. Freeman</u>, 34 F.3d 266, 270 n. 2 (4th Cir. 1994) (quoting <u>Martinez v. Mathews</u>, 544 F.2d 1233, 1243 (5th Cir. 1976)). A mandatory injunction is warranted in only the most extraordinary circumstances. <u>Id.</u> (citing <u>Wetzel v. Edwards</u>, 635 F.2d 283, 286 (4th Cir. 1980)). Further, it is well established that "absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities." <u>Taylor</u>, 34 F.3d at 268; <u>see</u> <u>Rogers v. Scurr</u>, 676 F.2d 1211, 1214 (8th Cir. 1982) ("judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.").

Plaintiff appears to seek preliminary injunctive relief insofar as he argues that he will continue to be irreparably injured by Defendants' conduct unless the Court grants injunctive relief. Although Plaintiff has stated claims that are sufficient to pass initial review, he has failed to demonstrate that he is likely to succeed on the merits. Therefore, his claim for preliminary injunctive relief will be denied.

## IV.    PENDING MOTIONS

### (1)    <u>Counsel</u>

There is no absolute right to the appointment of counsel in civil actions such as this one. Therefore, a plaintiff must present "exceptional circumstances" in order to require the Court to seek the assistance of a private attorney for a plaintiff who is unable to afford counsel. Miller v. Simmons, 814 F.2d 962, 966 (4th Cir. 1987).

In a Letter dated October 11, 2018, that has been docketed as a Motion to Appoint Counsel, Plaintiff sets forth some of the conditions of his confinement including the fight with Defendant Bresch at the end of which he states "I do need an Attorney, please appoint me one." (Doc. No. 3 at 1). In a second Letter dated November 6, 2018, that has been docketed as a Second Motion to Appoint Counsel, Plaintiff again sets forth some of the conditions of his confinement and states "Please assign me an attorney." (Doc. No. 1 at 1).

The record reflects that Plaintiff has been able to adequately represent himself in these proceedings and he has failed to demonstrate the existence of exceptional circumstances that justify appointment of counsel. Therefore, Plaintiff's Letters will be construed as Motions seeking the appointment of counsel and will be denied.

**(2)** **Default**

Plaintiff has filed a Letter asking the Court to "file a motion directing defendants to reply [and for] default judgment." (Doc. No. 11 at 1).

Plaintiff's Letter fails to comply with Rule 55 of the Federal Rules of Civil Procedure and, as no Defendant has been served to date, they have had no obligation to file an Answer or otherwise respond to the Amended Complaint. Defendants are not in default and accordingly Plaintiff's Letter will be construed as a Motion for Default Judgment and will be denied.

**V.  CONCLUSION**

For the reasons stated herein, the Amended Complaint is sufficient to proceed against

Defendants Palmer, Patterson, Bresch, and Colwell for deliberate indifference to serious medical and dental needs and the deprivation of property without due process; against Defendants Palmer, Patterson and Bresch for conditions of confinement that violate substantive due process, procedural due process and North Carolina law, interfering with mail, and retaliation; and against Defendant Bresch for the use of excessive force. The remaining claims are dismissed for failure to state a claim on which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). The Motion for Preliminary Injunction incorporated in the Amended Complaint is denied. Plaintiff's Letters seeking the appointment of counsel and default judgment are construed as Motions and are denied.

**IT IS THEREFORE ORDERED** that:

1. Plaintiff's § 1983 claims survive initial review under 28 U.S.C. § 1915 against: Defendants Palmer, Patterson, Bresch, and Colwell for deliberate indifference to serious medical and dental needs and the deprivation of property without due process; against Defendants Palmer, Patterson and Bresch for substantive due process, procedural due process, and North Carolina law with regards to conditions of confinement, interfering with mail, and retaliation; and against Defendant Bresch for the use of excessive force.

2. The Court will exercise supplemental jurisdiction over Plaintiff's claim under North Carolina law.

3. The remaining claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

4. The Motion for preliminary injunctive relief contained in the Amended Complaint is **DENIED.**

5. Plaintiff's Letters, (Doc. Nos. 3, 7), are construed as Motions for the Appointment of Counsel and are **DENIED**.

6. Plaintiff's Letter, (Doc. No. 11), is construed as a Motion for Default Judgment and is **DENIED**.

7. **IT IS FURTHER ORDERED THAT** the Clerk is directed to mail summons forms to Plaintiff for Plaintiff to fill out and return for service of process on **Defendants Palmer, Patterson, Bresch,** and **Colwell**. Once the Court receives the summons forms, the Clerk shall then direct the U.S. Marshal to effectuate service on Defendants. The Clerk is respectfully instructed to note on the docket when the forms have been mailed to Plaintiff.

Signed: February 26, 2019

Frank D. Whitney
Chief United States District Judge